UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 07-22433-CIV-HUCK/SIMONTON

LARRY KLAYMAN,

  Plaintiff,
vs.

FREEDOM'S WATCH, INC., BRADLEY
BLAKEMAN, ARI FLEISCHER, MEL
SEMBLER, WILLIAM P. WEIDNER,
MATTHEW BROOKS, ANTHONY GIOIA,
KEVIN MOLEY, HOWARD LEACH, ED
SNIDER, SHELDON ADELSON and
RICHARD FOX,

  Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

  This cause is before the Court on Defendants' Motion for Summary Judgment, filed January 7, 2008 [D.E. #102]. Plaintiff filed his Opposition to Defendants' Motion for Summary Judgment on February 25, 2008 [D.E. #130], and Defendants filed their Reply on March 4, 2008 [D.E. #137]. The Court heard oral argument on the Motion for Summary Judgment on Friday, March 14, 2008. Plaintiff originally filed his Complaint in this matter on September 17, 2007 [D.E. #1], and Defendants filed a joint Answer on October 12, 2007 [D.E. #21].

  Klayman asserts the following six claims in his Complaint: (1) Federal trademark dilution (15 U.S.C. § 1125(c)); (2) Federal false designation of origin (15 U.S.C. § 1125(a)); (3) Florida state trademark infringement (Fla. Stat. § 495.131); (4) Florida state trademark dilution (Fla. Stat. § 495.151); (5) Unfair Competition under Florida Statute; and (6) Florida common law trademark infringement.[1]

---

[1] In his Motion for Sur-reply on Defendants' Motion for Summary Judgment or to Amend Complaint, Klayman claimed he had asserted a claim for false advertising under § 1125(a) in his Complaint. At oral argument, however, Klayman acknowledged that he did not properly allege that claim in his Complaint, and it is thus not before the Court.

I.  **BACKGROUND**[2]

      This is a case about trademark infringement. The framework of this dispute began in 1994, when Plaintiff Larry Klayman, a lawyer, founded a group called Judicial Watch, Inc. ("Judicial Watch"). The stated purpose of Judicial Watch was to use the "court system to watch the other two branches of government" and to watch the court system to "keep it ethical." Thereafter, Klayman created the International Center for Economic Justice, Inc. ("ICEJ") in 1995 as a non-profit corporation in Washington, D.C. The purpose of the ICEJ was to promote the cause of free trade by working to eliminate trade barriers and economic discrimination, to operate as a center for the study of trade issues, and to monitor trade-related events, trade policy decisions and court decisions affecting trade and trade-related issues. The ICEJ did not conduct many activities during its existence. Klayman worked for Judicial Watch until 2003.

      During this time period, in 2000, the fictional television show *The West Wing* created a character named "Harry Claypool," who ran a fictional organization named "Freedom Watch." Claypool was portrayed as a gadfly to the White House, and the character appeared over a span of two or three episodes. Klayman contends that this storyline was based on a fictional depiction of him and his organization, Judicial Watch. Defendants argue that there is no evidence to support Klayman's contention that the fictional depictions were based on him.

      Around November 15, 2004, Klayman and the President of the ICEJ, Paul Rodriguez, changed the corporate name of ICEJ to Freedom Watch, Inc. The District of Columbia certified the name change

---

[2] The parties acknowledged during oral argument that there are few, if any, disputed facts in this case. Local Rule 7.5 requires that parties' statements of material facts submitted in support of or in opposition to a motion for summary judgment shall be supported by specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits. Furthermore, Local Rule 7.5 provides that any material facts set forth in the movant's statement of material facts will be deemed admitted by the nonmovant unless controverted by nonmovant's statement of material facts. Because Klayman did not controvert any of the material facts set forth by Defendants through specific references to evidence in the record in his Opposition, Defendants' facts are taken as true for the purposes of Defendants' Motion for Summary Judgment. And to the extent that Klayman's factual assertions are supported by specific record evidence, the Court takes those facts as true as well.

on January 7, 2005. According to Klayman, the mission of Freedom Watch, Inc. is to "promote and protect freedom both domestically and abroad as a public interest watchdog."

Meanwhile, Defendant Freedom's Watch, Inc. was certified as a non-profit corporation on July 16, 2007 by the District of Columbia. Its stated purpose is "to promote, among other things, a strong national defense and foreign policy, smaller government, the preservation of domestic constitutional freedoms, and freedom around the world." The individual Defendants are the directors of Freedom's Watch, Inc. In order to carry out its mission, Freedom's Watch, Inc. engages in grassroots lobbying, education, and information campaigns. Shortly after its incorporation, Freedom's Watch, Inc. began an aggressive advertising campaign that included direct mailings soliciting funds from potential supporters. One person who received the direct mailing from Freedom's Watch, Inc. was Louise Benson, a personal acquaintance and longtime supporter of Klayman whom he describes as a "surrogate mother." Upon receiving the mailing, Ms. Benson was confused between Defendants' Freedom's Watch, Inc. and Klayman's Freedom Watch, Inc. because of the similarity of the names.

In addition to the parties and organizations involved here, several others have used the name Freedom Watch. For example, U.S. Congressman Ron Paul distributes an email newsletter called "FREEDOM Watch" as part of his "Project Freedom" initiative. Other users include the following: the U.S. military's publication of a magazine called "Freedom Watch"; a religious organization's publication called "Religious Freedom Watch"; a human rights organization named "Philadelphia Freedom Watch"; the Miami Chapter of the American Civil Liberties Union of Florida's production of a television series called "Freedom Watch"; and various others identified by the parties.

Between the time Klayman's Freedom Watch, Inc. adopted its name in November 2004, and Defendants' Freedom's Watch, Inc. adopted its name in July 2007, Freedom Watch, Inc.'s efforts to establish its name and carry out its mission were minimal and sporadic. Klayman initially sought to register Freedom Watch as a trademark when he sent a letter on November 24, 2004 to Rodriguez, asking him to start the trademark registration process. Five days later, Klayman filed an application with the Patent and Trademark Office ("PTO") to try to register Freedom Watch as a trademark, but that application ultimately was rejected on July 8, 2005. When Klayman did not respond to the rejection,

3

the PTO notified Klayman that the application had been abandoned in early 2006. Then, on August 23, 2007, just prior to filing this lawsuit, Klayman reapplied to the PTO for trademark registration of Freedom Watch. The PTO published the application for opposition. Defendants promptly opposed the application and moved to stay the PTO's decision-making process pending this Court's decision in this case. The PTO granted the stay.

Meanwhile, Freedom Watch, Inc.'s fundraising efforts between November 2004 and July 2007 were minimal, and it raised no money prior to July 16, 2007.[3] In March 2005, Klayman sent a letter to Ms. Benson explaining Freedom Watch, Inc.'s purpose and asking for a donation. Klayman testified that he probably sent a similar letter to 20 or 30 people. It does not appear that Klayman was able to raise any money through these or other efforts.

At the same time, Klayman and Rodriguez took the following action to promote and advertise Freedom Watch, Inc.:

- Rodriguez distributed fewer than 500 copies of Freedom Watch, Inc. materials, 100 of which were a brochure he created;
- Klayman distributed between 20 and 50 brochures;
- Preparations for a Web site were begun in early 2005, but the site was not active until September 14, 2007;
- Freedom Watch, Inc.'s total expenditures were $1,680;
- Prior to July 2007, Freedom Watch, Inc. ran no print, television, radio, or direct mail advertisements;
- Klayman ran an advertisement in the national weekly edition of *The Washington Times* on July 16, 2007, costing $2,000, which promoted his organization and solicited contributions;
- Klayman sent direct mail solicitations for contributions on October 24, 2007.[4]

---

[3] Freedom Watch, Inc. took in approximately $52,000 in 2007, but Klayman testified that all of that money was raised after September 1, 2007.

[4] While Klayman broadly, and in vague terms, asserts that since 2004 he has "continued to produce and maintain promotional materials, budgets, business plans and other organization materials and intellectual property . . . for Freedom Watch," he provides no detail or support for this assertion. *See* Pl.'s Opp. To Def.'s Mot. for Summ. J., at 7-8. Furthermore, he asserts that he and his agents "have spent thousands of dollars . . . in my effort to advertise, promote, and develop good will for the Freedom Watch mark." *Id.* at 9. But Klayman has not quantified these expenditures for the Court, and because he does not provide specific references to record evidence, as Local Rule 7.5 requires, regarding the exact amounts of these expenditures, the Court cannot quantify these assertions. However, Defendants quantify Klayman's assertions by providing specific detail about

4

Furthermore, Freedom Watch, Inc.'s operational activities were minimal. For example, Klayman directed Russell Verney, a third person helping set up Freedom Watch, Inc., to draft a "Startup Plan" and "Startup Budget," but those were never implemented. Also, Klayman spent 10 months in 2006 working as an attorney for a Cleveland-based law firm, during which he spent virtually no time on Freedom Watch, Inc.

In terms of substantive work, Freedom Watch, Inc. engaged in very few activities to carry out its stated mission. Klayman issued two press releases as founder of Freedom Watch, Inc.: The first regarded an ethics complaint against Durham District Attorney Michael Nifong surrounding the rape charges he brought against three Duke University lacrosse players; and the second regarded a lawsuit filed to block the building of a mosque. The Nifong press release is entitled "Founder of Judicial Watch Charges Prosecutorial Abuse," and it identifies Klayman as the founder of Freedom Watch, Inc. in the text. The press release was reported on by two Web logs. The press release regarding the lawsuit filed to block the building of a mosque identifies Klayman as the founder, president, and a director of Freedom Watch, Inc. in the text of the release. Finally, Klayman was also mentioned as an attorney for Freedom Watch, Inc. in an article about the Terry Schiavo case from 2005.

## II.  DISCUSSION

Despite Klayman's impassioned descriptions of his accomplishments as an independent protector of the public interest – and he may well have many – this case is only about whether Klayman has a protectable service mark[5] in the Freedom Watch name. The Court finds that he does not.

*A.     Standard*

Summary judgment is appropriate if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of

---

the exact expenditures and revenues of Freedom Watch, Inc., amply supported by the record.

[5] The parties use both "trademark" and "service mark." The proper term for a trademark involving services instead of goods is "service mark," but the terms are used interchangably.

the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Allen,* 121 F.3d at 646. On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party, and determine whether that evidence could reasonably sustain a jury verdict. *Celotex*, 477 U.S. at 322-23; *Allen,* 121 F.3d at 646.

While the burden on the movant is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 252. A mere "scintilla" of evidence in favor of the nonmoving party, or evidence that is merely colorable or not significantly probative is not enough. *Id.*; *see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (holding that conclusory allegations and conjecture cannot be the basis for denying summary judgment).

      B.      *Lanham Act Claims*

A service mark is "any word, name symbol, or device, or any combination thereof [used] . . . to identify and distinguish the services of one person . . . from the services of others and to indicate the sources of the services." 15 U.S.C. § 1127. To succeed on a service mark infringement claim, a plaintiff must show (1) a valid service mark, and (2) defendant's adoption of an identical or similar mark that was likely to create confusion for consumers between the two. 15 U.S.C. § 1125(a); *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797 (11th Cir. 2003). Klayman must demonstrate, as a prerequisite to recovery under all of his claims, that he has a protectable right in Freedom Watch. *Gift of Learning*, 329 F.3d at 797. In other words, if the federal service mark claim fails – i.e. Klayman does not have a protectable right in Freedom Watch – then all of Klayman's other claims will fail as well. Only if Klayman has a protected right in the mark "need [a court] reach the issue of whether it has also proved the likelihood of confusion between the two names, the other element needed for recovery." *Am. Television and Commc'ns Corp. v. Am. Commc'ns and Television, Inc.*, 810 F.2d 1546, 1548 (11th Cir. 1987).

In order for Defendants to have infringed on Klayman's service mark, Klayman must

6

demonstrate that he has a protectable right in Freedom Watch. "Ordinarily, such an interest is derived when a business uses a mark to represent its services." *Investacorp Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1522 (11th Cir. 1991). But an organization does not have ownership rights in a mark simply because it used it. Rather, an organization will "obtain rights in a mark upon first use only if the mark is 'inherently distinctive.'" *Id.* (quoting J.T. McCarthy, Trademarks and Unfair Competition § 16:2 (2d ed. 1984)).

Marks are generally classified in four different categories, in order of increasing distinctiveness: (1) generic (least distinctive), (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful (most distinctive). Generic marks suggest the basic nature of the article or service, and are generally incapable of obtaining trademark protection because they are not distinct. *Id.* Descriptive terms identify a characteristic, quality, or function of a product or service. *Deltona Transformer Corp. v. Wal-mart Stores, Inc.*, 115 F.Supp.2d 1361, 1365 (M.D. Fla. 2000). A descriptive mark may gain a protectable interest in the trademark only if it has acquired a secondary meaning. *See Investacorp*, 931 F.2d at 1522. The latter two categories of trademarks, suggestive and arbitrary or fanciful, are "deemed inherently distinctive" and are automatically entitled to protection. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). A suggestive term "suggests the characteristics of the service 'and requires an effort of the imagination by the consumer in order to be understood as descriptive' of the service." *Investacorp*, 931 F.2d at 1523 (quoting *Am. Television*, 810 F.2d at 1549). And an arbitrary or fanciful term bears no relationship to the product or service. *Id.* Thus, the Court must first determine whether the term Freedom Watch is inherently distinctive in order to assess whether Klayman has obtained an ownership right in the mark.

Courts typically look to several factors to distinguish between a descriptive and distinctive mark. First, courts analyze the term at issue and what the words themselves describe. *See id.* (holding that "Investacorp" was not arbitrary or fanciful because the combination of the words "invest" and "corporation" bore a relationship to the "type of services being offered by plaintiff"); *Gift of Learning*, 329 F.3d at 799 (holding the words DRIVE PITCH & PUTT were the names of golf shots, and that these terms were descriptive of the activities taking place at various competitions). Second, courts consider

the idea conveyed to a customer or observer by the plain dictionary meaning of the words comprising the mark. *See Investacorp*, 931 F.2d at 1523 (finding the term "Investacorp" "literally convey[s] to the observer that [the company] is in the business of investing in corporations"); *Deltona*, 115 F.Supp.2d at 1367 (finding the term "Battery Tender" descriptive and not suggestive because it requires "no effort of the consumer's imagination in order to be understood as descriptive of a battery charger"). Third, courts look to third-party usage as probative evidence. *See Investacorp*, 931 F.2d at 1523. Courts look to the *actual* use of the terms in commerce. *See id.* And courts also look to the *prospective* use by competitors to determine whether the formative words of a phrase are likely to be used by competitors in the industry. *See id.* (holding that competitors likely will need to use the terms "invest" and "corp" because those words pervade "the lexicon of business terminology" and are "indispensable to the investment services industry").

As an additional note, a plaintiff need not register a trademark as a prerequisite to a service mark infringement claim under the Lanham Act. *Two Pesos, Inc.*, 505 U.S. at 768. Likewise, registration of a mark leads only to a rebuttable presumption of validity, and an opponent of the registration can provide proof of descriptiveness or genericness to overcome the presumption. *Deltona*, 115 F.Supp.2d at 1365. "Registration of the mark, therefore, provides the plaintiff with a presumption that the mark is 'not merely descriptive or generic, or, if merely descriptive, is accorded secondary meaning. This presumption may, of course, be overcome by proof of descriptiveness, or by proof of genericness.'" *Id.* (quoting *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 935 (7th Cir. 1986)).

    C.    *Nature of Freedom Watch – Descriptive or Distinctive?*

Defendants argue that Freedom Watch is a descriptive term and is thus not inherently distinctive. Klayman, on the other hand, does not meaningfully address Defendants' argument, either in his memorandum or at oral argument. In fact, he does not clearly articulate any viable argument as to whether the term is descriptive or distinctive.[6] He simply argues that the name is distinctive because of his long history as a public-interest watchdog. Klayman's main argument is that the PTO's publication

---

[6] At oral argument, Klayman suggested that Freedom Watch is arbitrary or fanciful, which clearly it is not.

of Freedom Watch in its official Gazette for public opposition amounts to a "preliminary factual finding" that the mark is distinctive and that the Court should adopt that finding. *See* 15 U.S.C. § 1062; 37 C.F.R. § 2.80.

The way to determine which category a particular phrase falls into is to begin with an analysis of the term itself. *See Investacorp*, 931 F.2d at 1523 (holding that "Investacorp" was not arbitrary or fanciful because the combination of the words "invest" and "corporation" bore a relationship to the "type of services being offered by plaintiff"). First, the Court finds the term Freedom Watch merely descriptive and not inherently distinctive because the words themselves describe the very mission of Klayman's organization – that is, to watch over and protect people's freedoms. In fact, Klayman notes that Freedom Watch, Inc.'s mission is "to promote and protect *freedom* both domestically and abroad as a public interest *watch*dog." Pl.'s Opp. to Defs.' Mot. For Summ. J., at 5 (emphases added). Klayman's use of the words that make up his organization's name to describe its mission underscores the descriptive nature of the term. In other words, the term Freedom Watch bears a direct relationship to the services the organization purports to offer.

Second, the Court finds that the idea conveyed to a customer or observer by the plain dictionary meaning of the words comprising the mark supports its conclusion that the term Freedom Watch is merely descriptive. *See Investacorp*, 931 F.2d at 1523 (finding the term "Investacorp" "literally convey[s] to the observer that [the company] is in the business of investing in corporations"); *Deltona*, 115 F.Supp.2d at 1367 (finding the term "Battery Tender" descriptive and not suggestive because it requires "no effort of the consumer's imagination in order to be understood as descriptive of a battery charger"). The plain dictionary meaning of the terms comprising Freedom Watch implies that the organization is in the business of watching over people's freedoms. And, not coincidentally, that is precisely what Klayman proclaims his organization's mission to be. It thus takes no stretch of the listener's imagination to figure out what the term Freedom Watch means; rather, one can naturally conceive of the term's meaning just by reading the words.

Third, the Court finds that the substantial third-party use of Freedom Watch serves as strong evidence of the term's descriptiveness. Included among the actual uses of Freedom Watch are the

9

following: U.S. Congressman Ron Paul's email newsletter; the U.S. military's magazine called "Freedom Watch"; a Web site dedicated to human rights called "Philadelphia Freedom Watch"; and several others. All of these uses suggest that the term is descriptive because the words are often necessary to describe organizations with a mission similar to that of Freedom Watch, Inc.

Moreover, *The West Wing* television program's fictional Freedom Watch buttresses the third-party evidence of descriptiveness. While Klayman emphasizes that the fictional character Harry Claypool was based on him, and that the fictional Freedom Watch was based on his Judicial Watch, he did not use the term Freedom Watch himself until 2004. Thus, even if the program did mean to fictionalize Klayman and his organization, the name of the fictional organization it chose was Freedom Watch – four years before Klayman adopted the term for himself. So instead of providing support for Klayman's argument that the public began to associate him with Freedom Watch in 2000, the program's use of the term actually illustrates just how common this phrase is in describing political activism. It thus provides further evidence of third-party use and serves to undermine Klayman's assertion that the term Freedom Watch is distinctive.

In addition to actual use, courts also may look to prospective use of third parties as evidence of descriptiveness. In *Investacorp*, the Eleventh Circuit analyzed whether the term "Investacorp" was merely descriptive or inherently distinctive. It held that the "likelihood of prospective use by competitors is high" because the formatives "invest" and "corp" "pervade the lexicon of business terminology" and are "indispensable to the investment services industry." 931 F.2d at 1523. Likewise, here, the terms "freedom" and "watch" are nearly ubiquitous in political activism. The terms are thus "indispensable" in that field, and it is highly probable that "competitors will need to use these terms." *Id.* Cutting off competitors from what amounts to a descriptive term (absent a showing of secondary meaning) would undermine the categorical system of trademarks federal law has established to protect inherently distinctive names.

Despite these indicia of descriptiveness, Klayman argues that the PTO's determination to pass on his registration application for opposition amounts to a "preliminary factual finding that [his] "Freedom Watch" mark is more than merely 'descriptive.'" Pl.'s Opp. to Defs.' Mot. For Summ. J., at

2. But when a plaintiff's application for trademark registration is allowed to pass for potential opposition (as here), the PTO's *ex parte* decision should not be construed as a determination on the mark's distinctiveness. In fact, it is impossible to know what evidence the PTO considered, and whether it had any information to contradict the information Klayman put before it. As the Eleventh Circuit has stated:

> The soft spot in appellant's argument is that there is no recorded finding by the PTO that either service mark was not descriptive. Consequently, all that this Court can do is guess at what the PTO's determinations were while evaluating the merit of each mark. We do not know whether the PTO even considered the descriptiveness of either mark. Although we will bestow proper respect to the determinations of the PTO, we will not defer to an ethereal determination that is not affirmatively stated by the administrative agency.

*Investacorp*, 931 F.2d at 1524. The PTO's actions are thus not determinative of whether Freedom Watch is merely descriptive or inherently distinctive, nor do they provide evidentiary support to make that determination.

For the reasons discussed above, the Court concludes that the issue of whether Freedom Watch is descriptive or distinctive involves no genuine issue of material fact for trial, and the Court holds that it is descriptive.

      *D.*     *Secondary Meaning*

Because Freedom Watch is a descriptive service mark, it is protectable only if it has acquired secondary meaning. *See id.* at 1522. Secondary meaning is the connection between the mark and the person or organization using the mark. *Gift of Learning*, 329 F.3d at 800. Klayman must demonstrate that Freedom Watch acquired secondary meaning before Freedom's Watch, Inc. began to use its name on July 16, 2007. *See* J.T. McCarthy, McCarthy on Trademarks and Unfair Competition § 16:34 (4th ed. 1997) ("[T]he senior user must prove the existence of secondary meaning in its mark at the time and place the junior user first began use of that mark."). Klayman has the burden, by a high degree of proof, to establish secondary meaning for Freedom Watch. *See Investacorp*, 931 F.2d at 1525.

A consumer evidence survey is usually the best way to demonstrate secondary meaning, but one is not required. *See Gift of Learning*, 329 F.3d at 800. Aside from a consumer survey, Courts consider

the following four factors to determine whether a particular mark has acquired secondary meaning: (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by plaintiff to promote a conscious connection in the public's mind between the name and the plaintiff's business; and (4) the extent to which the public actually identifies the name with plaintiff's goods and services. *Investacorp*, 931 F.2d at 1525. Because Klayman has not provided survey evidence in this case, the Court will consider the four factors discussed above to determine whether Freedom Watch has acquired secondary meaning.

Since he began Freedom Watch, Inc. in 2004, Klayman's use of the mark has been sporadic. He issued two press releases – regarding the Nifong prosecution and the lawsuit to block the mosque construction – that received minimal press coverage. But press releases and minimal press coverage, in which Klayman's connection to Freedom Watch, Inc. was buried in the text, are "not the type of exposure of a mark that would be expected to have any significant impact on the purchasing public." *The Cascades of Levitt Homes, Inc. v. Cascades of Sabatello Dev. Corp.*, 43 U.S.P.Q.2d 1920, 1926 (S.D. Fla. 1997).

Moreover, the nature and extent of Klayman's advertising and promotion of Freedom Watch clearly was not enough to establish secondary meaning with the relevant public. In *Gift of Learning*, Plaintiff generated $6,000-$8,000 in licensing fees over a three-year period, and spent $10,000 per year on marketing expenses over a three-year period in order to promote golf skills challenges for kids. 329 F.3d at 801. But the court there held that such advertising and promotion was "less than overwhelming," and was not enough to promote a connection between the mark and its business in the public's mind. *Id.* Likewise, here, Klayman's attempts to advertise and promote Freedom Watch were similarly underwhelming. To be sure, each inquiry into secondary meaning must be viewed in context, but Klayman's advertising and promotion have been sparse. He thus would be hard pressed to reasonably argue that his efforts established a connection in the public's mind between the term and his organization.

Among the promotional activities undertaken by Klayman were the following: a letter in 2005

12

to 20 or 30 people soliciting contributions[7]; the creation of a brochure, very few of which were ever actually distributed; total expenditures during the relevant time period of just $1,680; an advertisement on July 16, 2007 (coincidentally, the date of Defendants' first use) in the national weekly edition of *The Washington Times* that cost $2,000; and very few, if any, contributions from donors during the relevant time period. Klayman also testified to promotional activities that were planned but did not reach the relevant public during the relevant time frame. For example, Klayman had discussions to set up a Web site in early 2005, but the earliest activity of the Web site was September 14, 2007. In addition, Klayman asserts in his affidavit that "efforts were made with . . . advertising consultants . . . to promote the mark Freedom Watch," but he provides no detail about what promotional materials they created, or which promotional materials actually reached the public, if any. Such minimal promotion and advertising cannot reasonably be viewed as establishing a connection between Klayman with Freedom Watch in the public's mind.

Furthermore, there is no evidence of any pervasive or sustained association between Klayman and Freedom Watch that would suggest that the relevant public identifies the two together. Aside from the confusion of Ms. Benson, whom Klayman describes as his "surrogate mother," concerning the letter she received from Defendants' Freedom's Watch, Inc., Klayman has presented no evidence supporting his argument that the public associates him closely with Freedom Watch. Although Klayman argues that the public came to associate him with Freedom Watch in 2000 because of *The West Wing* television program's depiction of "Harry Claypool," Klayman has provided no evidence that the program was actually depicting him on the show. More importantly, there is no evidence that the *public* came to associate Klayman with Freedom Watch by virtue of watching the show. Notwithstanding the two press releases Judicial Watch issued after the program aired linking Klayman to "Claypool," it is highly unlikely the public came to associate Klayman with Freedom Watch after watching *The West Wing* in 2000 when Klayman himself did not start Freedom Watch, Inc. until 2004. More importantly, there is no evidence of such an association.

---

[7] Klayman produced only one letter, sent to Ms. Benson, but he testified that he sent 20 or 30 others as well.

For the reasons discussed above, the Court concludes that the public does not identify Klayman and Freedom Watch, and that there are no material facts in dispute for trial on the issue of whether Klayman's Freedom Watch acquired secondary meaning. Because Klayman has no protectable interest in Freedom Watch, Defendants are entitled to summary judgment on the Lanham Act claims.[8]

    E.    *Klayman's Remaining Claims*

Because Klayman has failed to demonstrate that he has a protectable interest in the Freedom Watch mark, Defendants are also entitled to summary judgment with respect to Klayman's other claims as well. *See Investacorp*, 931 F.2d at 1521 (holding that the analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim).

## III.    CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED.

DONE AND ORDERED in chambers, Miami, Florida, this 24th day of March, 2008. The Court will enter final judgment accordingly.

_____
Paul C. Huck
United States District Judge

Copies furnished to:
All Counsel of Record

---

[8] Klayman argues that Defendants intentionally copied Freedom Watch from him and switched it to Freedom's Watch to mask the obvious copying, causing confusion among the relevant public. But the Court has already found the term Freedom Watch to be descriptive words in the public domain. Thus, any confusion created by Defendants' use of the term is "irrelevant unless the mark is protectable in the first instance." *Gift of Learning*, 392 F.3d at 801.